<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

FRANK VANDEVER,                      :
                                     :     Civil Action No. 04-0877 (WGB)
              Petitioner,            :
                                     :
         v.                          :     **OPINION**
                                     :
ATTORNEY GENERAL FOR THE             :
STATE OF NEW JERSEY,                 :
                                     :
              Respondent.            :

**APPEARANCES:**

Petitioner <u>pro</u> <u>se</u>              Counsel for Respondents
Frank Vandever                       John Joseph Scaliti, Esq.
177211                               John L. Molinelli, Esq.
MCI                                  Bergen County Prosecutor
1151 East St. So                     Bergen County Justice Center
Suffield, CT  06080                  Hackensack, NJ 07601

**BASSLER**, District Judge

        Petitioner Frank Vandever, a prisoner currently confined by

the Connecticut Department of Correction on charges unrelated to

those challenged here, has submitted a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254.  The respondent is

the Attorney General of New Jersey.

        For the reasons stated herein, the Petition must be denied.

## I.   BACKGROUND

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> Defendant, Frank Vandever, was charged in a nine-count indictment with armed robbery of Crosby Jewelers in Rutherford and two 7-11 stores in Montvale and Waldwick, N.J.S.A. 2C:15-1 (counts one, two, three, six, and nine); possession of a knife with purpose to use it unlawfully, N.J.S.A. 2C:39-4d (counts four and seven); and unlawful possession of a knife, N.J.S.A. 2C:39-5d (counts five and eight).  After a jury trial, defendant was convicted on all counts.

> Defendant was sentenced on count one to twenty years imprisonment with ten years parole ineligibility consecutive to a term he was then serving in Connecticut; fifteen years with five years parole ineligibility on count four, consecutive to count one; fifteen years with five years parole ineligibility on count seven, consecutive to count one.  Concurrent five year terms were imposed on counts two and five, and concurrent eighteen month terms on counts three and six.  The aggregate sentence was fifty years imprisonment with twenty years parole ineligibility, consecutive to the Connecticut term.  ...

> The chain of events leading to the crimes charged in this case commenced on New Year's Eve 1991 when defendant and Ronald Rutan escaped from a maximum security prison located in Somers, Connecticut. Vandever, a former Paine Webber broker, was serving a life sentence for the murder of one of his clients.  To facilitate their escape, defendant and Rutan tied up a husband and wife who were cleaning a local office building, robbed the couple at knife point, and stole their 1989 Jeep Comanche.  Defendant and Rutan traveled

---

[1]  Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

together from New Year's Eve until Rutan was arrested on January 16, 1992.  During this time, on January 7, 1992, Vandever took a room at the Econo-Lodge Motel in Rockland County, New York,  This motel room served as a hiding place during and after the pair's robbery of three stores in the Northern New Jersey area.

On January 6, 1992, Ray Misajet, Kathleen Weigand, and Patricia Scannell were working at Crosby Jewelers in Rutherford.  Misajet owned the jewelry store.  Rutan entered the store requesting to see the store's selection of engagement rings.  Misajet showed the man the engagement rings.  Before leaving the store, Rutan approached both Weigand and Scannell to inquire about the pearls that were on display.  During his approximately ten minute conversation with the two women, Rutan also asked when the store closed.  Weigand replied that the store normally closed between five o'clock and five fifteen in the afternoon.

The next day, January 7, 1992, at about 5:15 p.m., Rutan again entered Crosby Jewelers, this time accompanied by another man.  Misajet, Weigand, and Scannell again were working at the store that afternoon.  Rutan approached Weigand and requested to see the engagement rings again.  The other man was standing with his back to the counter at the front of the store.  When Weigand saw the other man, she asked him twice whether he needed any  help.  Both times, the other man did not reply to her question or turn around to face her.  When Weigand asked the third time whether she could help him, the other man started to turn, replying, "You sure can" or "Sure you can" and pulled a knife from the gray duffel bag he was carrying.  The knife was a large butcher knife with a black handle and a wide blade.  With the knife in his right hand, the man turned and attempted to grab Weigand's arm.  As soon as Weigand saw the man remove the knife from his bag, she ran to the back of the store, pushed Scannell into a back bathroom with her, and pushed the alarm.  Neither Weigand nor Scannell ever saw the other man's face.

while Weigand and Scannell were still in the bathroom, Rutan pulled out a gun and yelled to Misajet, ordering him not to activate the alarm.  When Misajet informed Rutan that he had already hit the alarm, both Rutan and the other man ran from the store.

3

Approximately six and one-half hours after the attempted robbery of Crosby Jewelers, a 7-11 store on Grand Avenue in Montvale was robbed.  The night clerk at the 7-11, Ivan Bukvic noticed Rutan enter the store at approximately 10:30 p.m. and walk over to the store's card selection.  Rutan remained there for approximately fifteen minutes before approaching Bukvic, asking if the store had any more cards, and then leaving.  About one hour later, the man returned to the store.  After walking through the store for a brief moment, Rutan approached Bukvic with a ten-inch-long steak knife and demanded that Bukvic get on the ground.  Rutan removed all of the cash, between $200 and $250, from the register and left the store.

Two days later, on January 9, 1992, another robbery occurred at a 7-11 on Wyckoff Avenue in Waldwick.  The overnight clerk, Walter Ackberg, observed Rutan enter the store at approximately 10:30 p.m. and obtain a soda.  When Rutan approached the cash register, he pulled out a gun and ordered Ackberg to get on the floor.  Rutan removed approximately $150 from the register and left the store.

Weigand and Misajet went to the Bergen County Sheriff's Department several days after the attempted robbery of the jewelry store to give a description and help the police develop a composite sketch of Rutan. Weigand was the only one of the three witnesses who could provide a physical description of the second individual carrying the gray duffel bag with the knife. Weigand described that individual as a white male, five feet, seven to eight inches tall, in his late thirties with short blonde hair.  However, Weigand never saw the second man's face and no composite sketch was drawn.

On January 10, 1992, Bukvic was shown the composite sketch of Rutan and identified him as the individual who had robbed his store on January 7.

Based on the composite sketch, Rutan was arrested several days later in the parking lot of an Econo-Lodge Motel on Route 59 in Rockland County, New York.  The following items were seized from a 1989 Jeep Comanche, which was in the Econo-Lodge parking lot:  a plastic toy gun, a page torn out of a Bergen County phone book with addresses of 7-11 stores, one Regent Sheffield knife with a black handle, and two of Rutan's

4

fingerprints.  The word "done" was inscribed next to the addresses and phone numbers of the Montvale and Waldwick 7-11 stores on the torn out page of the phone book.  Except for the fingerprints and a copy of the torn out phone book page, the evidence seized from the Jeep was inadvertently destroyed by Connecticut police prior to trial.

Subsequent to Rutan's arrest, Weigand, Misajet, Bukvic, and Ackberg were called to the police station and separately asked to identify the person who robbed or attempted to rob their stores out of a photo array of six individuals.  All four witnesses picked Rutan's photograph as the individual who robbed their stores.

No fingerprint or other physical evidence was found at the scene of the attempted robbery in Rutherford or at the robberies in Montvale and Waldwick.  However, on January 7, 1992, Vandever registered for a room at the Econo-Lodge Motel in Rockland County, New York where Rutan was arrested.  It was stipulated that Vandever had been seen driving the 1989 Jeep Comanche several days before Rutan was arrested.

Vandever was brought into the police station for questioning on an unrelated matter on January 18, 1992. After being read his Miranda[] rights by Paramus police detective Joseph Ackerman, Vandever agreed to speak with the police and admitted the following:  1) that he and Rutan had committed about four robberies within about a one week span, 2) that they robbed mostly 7-11s, 3) that they robbed a 7-11 in Montvale, 4) that he couldn't remember the names of the other towns because he wasn't familiar with the area and the towns "all ran together," 5) that they used fake guns, 6) that his role was limited to opening the cash register, and 7) that their methodology included casing the store and ordering the victims to the floor.

(Resp. Ex. 4 at 1-7, Opinion of Appellate Division, Jan. 22, 2003 (footnote omitted).)

Following his conviction, Petitioner appealed.  On January 22, 2003, the Appellate Division affirmed.  The New Jersey

Supreme Court denied Petitioner's petition for certification on October 16, 2003.  State v. Vandever, 178 N.J. 32 (2003).  This Petition followed.

Petitioner asserts ten grounds for relief.  Respondents have answered on the merits; Petitioner has not filed a reply.  This matter is now ripe for determination.

## II.   28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the

6

governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II).  A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter).  Id. at 407-09.  To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409.  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.   Chadwick v.

7

Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies. See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

8

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  <u>See</u> <u>Royce v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Lewis v. Attorney General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989); <u>United States v. Brierley</u>, 414 F.2d 552, 555 (3d Cir. 1969), <u>cert. denied</u>, 399 U.S. 912 (1970).]

III.   <u>ANALYSIS</u>

A.   <u>Indictment</u>

Petitioner contends that there was insufficient evidence to support the indictment.  In addition, Petitioner contends that the Prosecutor wrongfully introduced escape evidence and told the grand jurors that they must find <u>both</u> Petitioner and his co-defendant guilty.

The Appellate Division rejected this claim.

> Prior to trial, defendant moved to dismiss counts one and seven claiming there was insufficient evidence before the grand jury to sustain his indictment on the Rutherford and Waldwick robberies.  He advances the same argument on appeal, which we reject.

> A motion to dismiss an indictment is addressed to the sound discretion of the trial court.  <u>State v. New Jersey Trade Waste Ass'n</u>, 96 N.J. 8, 18-19 (1984).  Such discretion should not be exercised except on "the clearest and plainest ground."  <u>State v. Weleck</u>, 10 N.J. 355, 364 (1952) (quoting <u>State v. Davidson</u>, 116 N.J.L. 325, 328 (Sup. Ct. 1936)).  Unlike the State's high burden of persuasion before a jury, the State must

submit only prima facie evidence that establishes that
a crime has been committed to support an indictment.
New Jersey Trade Waste Ass'n, supra, 96 N.J. at 27.
Furthermore, the State is merely required to present
the grand jury with "some evidence" as to each element
of a prima facie case.  State v. Bennett, 194 N.J.
Super. 231, 234 (App. Div. 1984) (quoting State v.
Donovan, 129 N.J.L. 478, 483 (Sup. Ct. 1943)).  Every
reasonable inference regarding the sufficiency of the
evidence in the indictment is to be given to the State.
New Jersey Trade Waste Ass'n, supra, 96 N.J. at 27.

We have reviewed the evidence before the grand
jury and conclude that it was sufficient to sustain the
indictment.  To a great extent the evidence before the
grand jury mirrored that presented at trial, which we
hereafter find sufficient (Point IV, infra).

In a related argument, defendant contends that the
indictment should have been dismissed due to
prosecutorial misconduct.  The asserted misconduct
related to evidence that defendant and Rutan had
escaped together from a prison in Connecticut.
Specifically, statements defendant contends prejudiced
the Grand Jury include the prosecutor's question to
Detective Ackerman regarding whether the police
department had received information that the defendant
"had been a fugitive from law from the state of
Connecticut"; the prosecutor's question and Detective
Ackerman's response revealing that defendant and Rutan
escaped from a Connecticut prison on New Year's Eve;
and the prosecutor's question and Detective Ackerman's
response revealing that the clothes found in the jeep
linked to defendant were the clothes that the men were
wearing when they escaped from prison.

We find no misconduct, much less prejudicial
misconduct.  The evidence was highly relevant and
properly adduced before the grand jury.  Although the
evidence as to defendant and Rutan's relationship
during the relevant time period was ultimately ruled
inadmissible at trial, out of an abundance of caution
on the part of the trial judge, that determination does
not somehow retroactively undermine the grand jury
proceedings.  Even if the evidence were considered
improperly admitted and prejudicial, that is not enough
to justify dismissal of an otherwise valid indictment.
State v. Scherzer, 301 N.J. Super. 363, 428 (App.

10

Div.), <u>certif. denied</u>, 151 N.J. 466 (1997).  Indeed,
most grand jury errors are rendered moot by conviction
after a fair trial.  <u>State v. Lee</u>, 211 N.J. Super. 590,
595-600 (App. Div. 1986).

(Resp. Ex. 4 at 9-11.)

The Fifth Amendment right to a grand jury presentation in
felony cases is not applicable to the states.  <u>Alexander v.
Louisiana</u>, 405 U.S. 625, 633 (1972).  Thus, any claim of defect
in a state grand jury proceeding is a claim of a state-law error
that does not raise federal constitutional concerns unless it
rises to the level of a due process deprivation.  <u>See</u> <u>Estelle v.
McGuire</u>, 502 U.S. 62, 68 (1991).  <u>Cf.</u> <u>U.S. v. Console</u>, 13 F.3d
641, 671-72 (3d Cir. 1993) (with the exception of a claim of
racial discrimination in the selection of grand jurors, a petit
jury's guilty verdict renders harmless any prosecutorial
misconduct before the indicting grand jury) (citing <u>Vasquez v.
Hillery</u>, 474 U.S. 254 (1986)).  Where any error in a state grand
jury proceeding is rendered harmless by a subsequent petit jury
verdict, there is no due process deprivation.  <u>See</u>, <u>e.g.</u>, <u>Lopez
v. Riley</u>, 865 F.2d 30, 32 (2d Cir. 1989); <u>United States v.
Mechanik</u>, 475 U.S. 66, 72-73 (1986) (involving a violation of
Fed.R.Crim.P. 6(d)).

Here, the petit jury found Petitioner guilty of the crimes
charged beyond a reasonable doubt, rendering harmless any error
in the state grand jury proceedings.  The decision of the
Appellate Division was neither contrary to, nor an unreasonable

11

application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Petitioner is not entitled to relief on this claim.

B.   <u>Evidence Issues</u>

Petitioner contends that the audio-tape should not have been admitted into evidence because no chain of custody was established.  He contends that the decision of the Appellate Division on interlocutory appeal was based upon incomplete information, although he does not explain what information was missing or how that should affect the decision.

Petitioner also contends that the Court should not have permitted admission of the prosecutor's transcripts of inaudible portions of the audio-tape.

Petitioner argues that the suggestions that he had committed prior offenses was prejudicial.

The Appellate Division rejected all of these evidence claims:

> Defendant argues that the State failed to provide a proper chain of custody for the audio-recording of the Paramus Police Department's interview with defendant and the transcript of that interview.
>
> On January 18, 1992, the police did audio-record a portion of their interview with Vandever.  Detective Ackerman and New York State police sergeant investigator Michael Greco were the primary police interviewers during Vandever's interrogation.  After the defendant was advised of his <u>Miranda</u> rights and the questioning began, Ackerman decided to tape the

12

conversation and left the interrogation room to retrieve a tape recorder. Ackerman returned with the tape recorder in his shirt pocket to record the remainder of the interview. Ackerman never disclosed to defendant that he was tape recording the interview. Prior to the tape running out, the Connecticut State Police arrived, requesting to interview defendant. At that point, Ackerman left the interview room with the tape recorder.

Ackerman then prepared a statement summarizing the contents of the recording. Captain Delaney of the Paramus Police Department, Ackerman's direct supervisor, then requested the tape and informed Ackerman that he would have it transcribed. Approximately two weeks later, Ackerman received a transcript of the tape, reviewed the transcript, and concluded that it accurately depicted the January 18, 1992 interview with defendant. Ackerman never saw nor reviewed the tape again until trial commenced in June 1998.

Investigator Greco of the New York State Police Department also received a transcript of the January 18 interview of defendant from the Paramus Police Department and verified the tape's accuracy.

The audio-recording of defendant's conversation with Ackerman and Greco was apparently stored in the allegedly "secure" desk of Paramus Police Chief Claude Major. Only a limited number of personnel had access to the desk and the tape was stored there until motions regarding the trial commenced in June 1998. No one at the police station actually knew that the tape was in the desk drawer until the tape was inadvertently discovered in June 1998.

Due to the inaudibility of portions of the original micro-cassette tape, the tape was redacted in July 1998 by the Paramus Police Department. The original micro-cassette was approximately forty-five minutes in length and the redacted version was approximately ten to twelve minutes in length.

Regarding the accuracy of the audio-recording, Ackerman testified at trial that he had surreptitiously taped a portion of defendant's confession; he did not mark or identify the tape in any manner, and although

13

the tab on the tape was broken to prevent it from being copied, he stated that he did not break the tab on the tape; the tape, which was not put in the evidence locker, was within the confines of the Paramus Police Department from the time it was made until trial, and the tape played in court was the tape that he recorded.

Whether a chain of custody has been sufficiently established to justify admission of evidence "is a matter committed to the discretion of the trial judge, and his determination will not be overturned in the absence of a clearly mistaken exercise thereof." State v. Brown, 99 N.J. Super. 22, 27 (App. Div.), certif. denied, 51 N.J. 468 (1968); see also State v. Morton, 155 N.J. 383, 446 (1998).

For an audio-recording to be admissible, the speakers must be identified and it must be shown that:

> 1) the device was capable of [taping] the conversation or statement; 2) its operator was competent; 3) the recording is authentic and correct; 4) no changes, additions or deletions have been made; and 5) in instances of alleged confessions, that the statements were elicited voluntarily and without any inducement.
> [State v. Driver, 38 N.J. 255, 287 (1962).]

Here, the State satisfied the Driver requirements.  The trial court found that Ackerman identified the speakers on the tape, identified that the Olympus micro-cassette recorder was capable of recording the conversation, and knew how to operate the recorder.  Further, Ackerman testified to the tape's authenticity, that defendant's statements were voluntary and that no changes had been made to the tape other than the redaction, which eliminated references to the prison escape and the theft of the Jeep.  Moreover, the trial court found that chain of custody began when Ackerman removed the tape recorder from a shelf at the police station and commenced the recording of defendant's interview.  Ackerman then passed the tape to Chief Delaney who secured it in his desk where it was not rediscovered until the commencement of the trial.  Although the tape would have been better authenticated if it was [kept] in an evidence locker between 1992 and 1998 and if the police department identified the contents of the tape

14

by appropriate outside labeling, in accordance with
Brown, absent evidence indicating any irregularities or
tampering to the audio-recording, the tape was
admissible.  Even if the tape itself was inadmissible,
Ackerman and Greco made written reports concerning the
contents of the tape and the overall interview with
defendant.  That evidence and the detectives' testimony
would have been admissible, rendering the admission of
the tape itself harmless.

(Resp. Ex. 4 at 11-14.)

Defendant contends that references to uncharged
offenses and the court's failure to provide a curative
instruction calls for reversal of his conviction.

Defendant addresses six specific statements, five
for the first time on appeal and one raised below, that
he alleges referenced his "other offenses."
Defendant's claims all lack merit.  When reviewing
these claims, it should be noted that, by stipulation,
the State was precluded from presenting testimony or
any evidence that defendant and Rutan escaped from a
Connecticut prison and were fugitives when they
allegedly committed the spree of robberies in Northern
New Jersey.

First, defendant argues that the witness list,
consisting of thirty-four law enforcement officers,
their ranks, and their branches of law enforcement, was
prejudicial and should not have been read at the
commencement of trial.  This argument, not raised
below, ignores logic.  All of these officers originally
were going to testify if they were needed about
defendant and Rutan's escape from prison and the string
of evidence that was connected to that escape.  It was
not until after the witness list was read that the
State was precluded from addressing the defendant's
escape.  If any error at all resulting in listing each
officer's rank and agency, it does not constitute plain
error.  R. 2:10-2.

Ackerman's testimony that when a suspect asks
about concurrent sentencing, it is usually an
indication that the suspect has had some contact with
the law, was objected to below.  The trial court
sustained defense counsel's objection and informed the
jury to disregard the police officer's response.

15

Defendant never requested that the trial judge also provide a curative instruction regarding Ackerman's response at the close of trial.  Any error resulting from this statement can be deemed no more than harmless.  R 2:10-2.

In closing, the prosecutor stated, "[o]nly a person who knew about these robberies would be able to tell the police what he told them.  Only a person who knew he was guilty would look to make a deal, would ask for charges to be run concurrent."  Defendant takes the prosecutor's use of the word "concurrent" completely out of context.  The statement was not in reference to Ackerman's earlier testimony regarding concurrent sentencing.  Instead, the prosecutor's statement sought to make the argument that defendant must be guilty of the robberies because he was asking whether the charges for the robberies could run concurrent.  Even if the prosecutor's statement reinforced Ackerman's earlier testimony in the minds of the jury, the issue, not raised below, does not constitute plain error.  R. 2:10-2.

Inspector's Greco's references to himself and Cliff Tallman, another officer who conducted the initial interview of defendant at the Paramus Police Department, as members of the Drug Enforcement Task Force in New York City and Rockland County respectively, was never objected to during the trial and, again, does not constitute plain error.  R. 2:10-2.

Finally, Greco's statement that the initial interview of defendant at the Paramus Police Department involved questions regarding the New Jersey robberies "and information regarding unrelated matters" also did not prejudice defendant.  Defendant actually stipulated that the phrase "information regarding unrelated matters" could be used to explain why and how defendant was apprehended by police.  That stipulation was utilized to shield the jury from knowing the specific reasons for defendant's arrest and thus to prevent prejudicial inferences.  Greco's statements, therefore, cannot be deemed improper.

None of the instances cited by defendant, either singly or taken together, warrant reversal of his conviction.

(Resp. Ex. 4 at 24-26.)

It is well-established that the violation of a right created by state law is not cognizable as a basis for federal habeas relief.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" (quoting Lewis v. Jeffers, 497 U.S. 764, 680 (1990))).  Accordingly, Petitioner cannot obtain relief for any errors in state law evidentiary rulings, unless they rise to the level of a deprivation of due process.  Estelle, 502 U.S. at 70 ("'the Due Process Clause guarantees fundamental elements of fairness in a criminal trial'") (quoting Spencer v. Texas, 385 U.S. 554, 563-64 (1967)

For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial.  See Chambers v. Mississippi, 410 U.S. 284 (1973); Keller v. Larkins, 251 F.3d 408, 413 (3d Cir.), cert. denied, 534 U.S. 973 (2001).

Neither singly nor collectively did the evidentiary rulings challenged here deny Petitioner a fundamentally fair trial.  The reference to other "unrelated" matters prevented the jury from learning about Petitioner's prior conviction, escape, and robbery to obtain the jeep.  Nothing about the identifications of the police ranks and affiliations of anticipated or actual police

17

witnesses impaired the fairness of Petitioner's trial.  One of the references to concurrent sentences was the object of an instruction to the jury to ignore the remark.  The other referred not to other offenses, but to serving concurrent terms for the offenses at issue at this trial, a fair comment on Petitioner's knowledge of his guilt.  Petitioner has failed to establish how any issue with respect to the chain of custody of the tape suggests any inaccuracy or tampering with the tape, other than the appropriate redactions.  Finally, Petitioner fails to establish how use of transcripts of the tape, complete or partial, in any way impaired the fairness of his trial.

The decision of the Appellate Division was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Petitioner is not entitled to relief on this claim.

C.   <u>Joinder of Counts</u>

Petitioner argues that the court should have permitted separate trials for "unrelated" offenses.  He states that the attempted robbery of the jewelry store had a different methodology and the victims' description of the other man is different from Petitioner's appearance.  Also, he notes that there was no mention of the jewelry store attempt in his questioning by police.

18

The Appellate Division rejected this claim:

Defendant argues that the court erred in denying his motion to require separate trials on each of the three robberies because the offenses were unrelated and their joinder prejudicial.

Rule 3:7-6 permits the joinder of offenses in the following circumstances "if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

Rule 3:15-2(b) provides relief from the joinder of offenses if the joinder would prejudice the defendant in the case.[] The trial court is accorded considerable discretion in determining whether to grant relief from joinder of offenses. State v. Pitts, 116 N.J. 580, 601 (1989). Absent an abuse of discretion we will defer to a trial court's decision concerning severance. State v. Chenique-Puey, 145 N.J. 334, 341 91996). The critical inquiry when discussing the prejudicial effects of the joinder of offenses is whether, if the offenses were tried separately, evidence of the offenses sought to be severed would be admissible under N.J.R.E. 404(b). Id. at 601-02. Evidence Rule 404(b) permits evidence of other crimes to prove motive, intent, and, significant here, common scheme or plan. Evidence of other crimes is admissible to demonstrate a common plan where "the several crimes may have sprung from a single motive, aiming at the accomplishment of the same end ... ." State v. Zicarelli, 122 N.J. Super. 225, 240 (App. Div.), certif. denied, 63 N.J. 252 (1973). Notably, more than factual similarity between the offenses is required to support joinder. State v. Lumumba, 253 N.J. Super. 375, 387 (App. Div. 1992). However, cases concerning the joinder of offenses under Rule 3:7-6 apply a broad interpretation of N.J.R.E. 404(b). Id. at 388. In State v. Louf, 64 N.J. 172, 178 (1973), the Court noted that "where [other crime] evidence tends to establish the existence of a larger continuing plan of which the crime on trial is a part, [that evidence] is admissible [to prove commission of the crime for which defendant is on trial]."

19

In this case, the trial judge properly concluded that the joinder of offenses was permissible under <u>Rule</u> 3:7-6 because the attempted robbery of Crosby Jewelers, the robbery of the Montvale 7-11, and the robbery of the Waldwick 7-11 were similar.  Rutan, a man with whom defendant admits committing robberies since their escape from a Connecticut prison, was identified as a participant in all three offenses.  A knife and toy gun, which were later discovered in a Jeep linked to defendant, were used in all three offenses.  The Montvale 7-11 robbery, to which defendant admits his participation, occurred just six hours after the Crosby Jewelers incident in Rutherford.  Defendant admitted that he and Rutan decided to rob 7-11's to get money and support themselves until they could obtain employment.  A page from the phone directory listing the 7-11 stores in Bergen County was discovered in an automobile linked to defendant.  There is evidence that a common routine was followed prior to and during the robberies: defendant and Rutan would first "case" the store to determine whether the clerks at the store were "wimps" and later they would return to the store and yell for the clerks to get on the floor.  These acts stemmed from a single motive -- to commit thefts to survive until the pair could obtain permanent employment -- and, thus, satisfies the definition of a common scheme.  <u>See</u> <u>State v. Zicarelli</u>, <u>supra</u>, 122 N.J. Super. at 240; <u>State v. Louf</u>, <u>supra</u>, 64 N.J. at 178. <u>See also</u> <u>State v. Pierro</u>, 335 N.J. Super. 109 (App. Div. 2002).

Although the connection between the Rutherford incident and the 7-11 robberies is not as evident, the Rutherford incident could also be considered a part of a common scheme.  The robbery of the 7-11 in Montvale, a crime in which defendant admitted his participation, occurred six hours after the Rutherford incident. Rutan was identified in the Rutherford incident. Defendant admitted to committing robberies with Rutan. Defendant discussed his plan to rob stores until he and Rutan obtained employment.  A knife was found in a jeep linked to defendant that was similar to the knife used in the Rutherford incident.  This evidence could be used at a separate trial for the other crimes because there is enough evidence to establish that the Rutherford incident was just a portion of defendant's larger plan.  Thus, the joinder of all three offenses

was not prejudicial and there was no abuse of
discretion on the part of the trial judge.

(Resp. Ex. 4 at 17-20 (footnote omitted).)

"Joinder of offenses rises to the level of a constitutional
violation only if it 'actually render[s] petitioner's state trial
fundamentally unfair and hence, violative of due process.'"
Herring v. Meachum, 11 F.3d 374, 377 (2d Cir. 1993), cert.
denied, 511 U.S. 1059 (1994) (quoting Tribbitt v. Wainwright, 540
F.2d 840, 841 (5th Cir. 1976), cert. denied, 430 U.S. 910
(1977)).

> [A]ll joint trials, whether of several codefendants or
> of one defendant charged with multiple offenses,
> furnish inherent opportunities for unfairness when
> evidence submitted as to one crime (on which there may
> be an acquittal) may influence the jury as to a totally
> different charge.  This type of prejudicial effect is
> acknowledged to inhere in criminal practice, but it is
> justified on the grounds that (1) the jury is expected
> to follow instructions in limiting this evidence to its
> proper function, and (2) the convenience of trying
> different crimes against the same person, and connected
> crimes against different defendants, in the same trial
> is a valid governmental interest.

Spencer v. Texas, 385 U.S. 554, 562 (1967).

In evaluating whether joinder has violated due process, it
is appropriate to focus on cross-admissibility of evidence and
the possibility of jury confusion.  See, e.g., Webber v. Scott,
390 F.3d 1169, 1178 (10th Cir. 2004); Davis v. Woodford, 384 F.3d
628, 638 (9th Cir. 2004), cert. denied, 126 S.Ct. 410 (2005) and
cases cited therein; Wharton-El v. Nix, 38 F.3d 372, 374-75 (8th
Cir. 1994).

21

Here, the state court determined that the charged offenses were part of a common scheme. This finding is presumed correct under 28 U.S.C. § 2254(e)(1). In addition, the trial court cautioned the jury to evaluate each crime separately.

> Now, there is in this indictment more than one crime. It is important for you as a jury to consider each crime independently of the other. The facts and evidence that were submitted should be considered separately as to each charge in the indictment and as to the accomplice charge.

(11T at 35-36.) Taken together, the existence of a common scheme and the cautionary instruction to determine each claim independently indicate that the joinder of counts did not deprive Petitioner of due process. Cf. Wharton-El v. Nix, 38 F.3d at 374-75.

The decision of the Appellate Division was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. Petitioner is not entitled to relief on this claim.

D.  Sufficiency of Evidence

Petitioner contends that the evidence is not sufficient to sustain his convictions in the jewelry store attempted robbery or the robbery of the Waldwick 7-11 store. He states that there was no identification by the victims and the victim at the 7-11 stated the robbery was done by a lone man with no accomplice waiting in a get-away car.

22

The Appellate Division rejected this claim:

Defendant contends that the evidence at trial concerning the Crosby Jewelers and Waldwick 7-11 robberies was insufficient and that his motion for judgment of acquittal on those charges should have been granted.  R. 3:18-1.  We disagree.  Judged under the standard established in <u>State v. Reyes</u>, 50 N.J. 454 (1967), the evidence was sufficient and the motion properly denied.

Defendant submits that since the clerk at the Waldwick 7-11 testified that he only saw one man, Rutan, at the store and that defendant never admitted to robbing the Waldwick 7-11, a jury could not have found him guilty beyond a reasonable doubt of the Waldwick robbery.

The evidence, albeit circumstantial, viewed in the light most favorable to the State, supports the jury finding of defendant's guilt.  Defendant admitted to robbing three or four 7-11's with Rutan.  The phone book page listing the 7-11's in Bergen County had the word "done" inscribed next to the 7-11's in Montvale and Waldwick.

The evidence is somewhat more equivocal as to whether defendant was guilty of robbing the jewelry store.  Despite defendant's physical likeness to the second man at the store, no one actually saw the second man's face.  Defendant specifically admitted to robbing 7-11's but never discussed a jewelry store incident. Even though defendant admitted to traveling with Rutan from December 31, 1991 until January 16, 1992, there is a possibility, however slight, that someone other than defendant accompanied Rutan when he robbed Crosby Jewelers.

Nevertheless, a trier of fact could find defendant guilty of attempting to rob Crosby Jewelers.  Rutan was identified in the Rutherford incident.  Rutan and defendant admittedly robbed a 7-11 in Montvale just six hours after the Rutherford incident.  A knife found in a jeep linked to defendant matches the description of the knife used in the Rutherford incident and defendant's physical appearance is similar to the description of the second man.  Thus, we conclude that the evidence as to both the jewelry store and Waldwick

robberies met the <u>Reyes</u> standard for submission to the
jury.

(Resp. Ex. 4 at 16-17.)

A claim that the jury's verdict was against the weight of
the evidence raises a due process concern.  Only where, "after
viewing the evidence in the light most favorable to the
prosecution, [no] rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt" should
the writ issue.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).
This standard must be applied "with explicit reference to the
elements of the criminal offense as defined by state law."
<u>Jackson</u>, 443 U.S. at 324, n.16.  <u>See also</u> <u>Orban v. Vaughn</u>, 123
F.3d 727 (3d Cir. 1997), <u>cert. denied</u>, 522 U.S. 1059 (1998).  As
noted above, state court factual determinations are presumed to
be correct.  <u>See</u> <u>Werts v. Vaughn</u>, 228 F.3d 178, 186 (3d Cir.
2000).

Here, Petitioner does not challenge the sufficiency of the
evidence that the crimes were committed, but challenges only the
sufficiency of the evidence that he was the perpetrator.  The
state court found that Petitioner did bear a physical resemblance
to the description of the second man at the attempted robbery of
the jewelry store; that finding is entitled to deference.  <u>See</u> 28
U.S.C. § 2254(e)(1).  The Appellate Division further found that
the evidence tying Petitioner to Rutan at the applicable time,
and the collateral evidence found in the jeep, were sufficient to

24

permit the inference that Petitioner had committed the attempted robbery of the jewelry store and the robbery of the Waldwick 7-11.

The decision of the Appellate Division was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Petitioner is not entitled to relief on this claim.

E.   Jury Instructions

Petitioner asserts that the Court's instruction on accomplice liability was incorrect and that the instruction on Petitioner's statement was unfair, inadequate, and prejudicial.

The Appellate Division rejected this claim:

> Defendant argues for the first time on appeal that the trial court's jury instructions denied him a fair trial because the instructions concerning accomplice liability lowered the State's burden of proof on that charge and the trial court failed to properly instruct the jury regarding the credibility of defendant's taped interview with the Paramus Police Department.
>
> When an error has not been brought to the trial court's attention, it does not constitute ground for reversal unless it is plain error.  R. 2:20-2.  However, a jury instruction that fails to communicate the State's burden of proving guilt beyond a reasonable doubt is not amenable to harmless-error analysis and requires reversal.  Sullivan v. Louisiana, 508 U.S. 275, 278-81, 113 S.Ct. 2078, 2081-83, 124 L.Ed.2d 182, 189-90 (1993).
>
> When reviewing reasonable doubt instructions, we cannot simply evaluate portions of the charge, but instead must consider the reasonable doubt instruction in its entirety.  State v. Medina, 147 N.J. 43, 51-52

25

91996), <u>cert. denied</u>, 520 U.S. 1190, 117 S.Ct. 1476, 137 L.Ed. 2d 688 (1997).  To this end, in <u>Medina</u>, a case addressing the definition of reasonable doubt, the Court found that although some parts of the charge were incorrect, when read in its entirety it was clear that the charge did not violate the defendant's due process rights.  <u>Id.</u> at 55-56.

A review of the trial court's jury instruction concerning accomplice liability reveals that the instruction explained that the State was alleging that defendant was guilty of the crimes committed by Rutan because defendant acted as his accomplice.  The trial court then stated:  "In order to find the defendant guilty the State must prove beyond a reasonable doubt each of the following elements ... ."[fn. 3]  The court repeated the phrase "beyond a reasonable doubt" five times throughout its explanation of robbery.  However, when addressing the elements of accomplice liability, the trial court omitted mention of the State's burden of proving defendant guilty beyond a reasonable doubt.  Regarding accomplice liability, the trial court outlined the elements as follows:

> Then we get back to the accomplice.  First, [that] Ronald Rutan committed the crime of robbery.  [Second, that] this defendant solicited him to commit it; and/or did aid him or attempted to aid him in committing it, and [third, that] this defendant possessed the criminal state of mind that is required to be proven against the person who actually committed the act.

However, after defining accomplice liability, the trial court summarized its charge by explaining three different times that in order to find defendant guilty under accomplice liability, the State must prove his guilt beyond a reasonable doubt.

> [fn. 3:  The instructions concerning accomplice liability for each count were the same.]

It is essential to read the trial court's charge as a whole.  In doing so, it is evident that the instruction did not lower the State's burden of proof concerning accomplice liability.  A portion of the

trial court's charge addressing accomplice liability
mirrors the accomplice liability Model Jury Charge by
including the State's burden of proof beyond a
reasonable doubt.  The phrase "beyond a reasonable
doubt" is stated nine times through the entire
accomplice liability charge.  And, although the trial
court failed to address the State's burden when he
initially addressed the elements of accomplice
liability, in his summary the trial judge restated the
elements of accomplice liability including the phrase
"beyond a reasonable doubt."  As in <u>Medina</u>, although
one part of the jury charge was incorrect, when the
charge is read in its entirety, the judge's omission
does not constitute plain error and defendant's due
process rights were not violated.

Defendant also contests, for the first time on
appeal, the jury instruction regarding the credibility
of defendant's recorded statements.  Defendant's
argument that the tape recording of his interview with
the Paramus Police Department on January 19, 1992 may
be inaccurate, and therefore lacking credibility,
relies on the facts that the tape was never marked for
identification, the tape was placed in the police
chief's desk drawer for six years, and the tape was
only rediscovered shortly prior to trial.

The instruction regarding the taped interview was
adequate and did not deny defendant a fair trial.  The
instruction specifically mirrored the Model Jury Charge
regarding tape recordings.  Prior to the charge,
defense counsel actually requested that the court
charge the jury regarding the tape using the Model
language.  As discussed in Point II, the tape satisfied
the <u>Driver</u> requirements and the tape's chain of custody
was properly established.

(Resp. Ex. 4 at 21-24.)

Generally, a jury instruction that is inconsistent with

state law does not merit federal habeas relief.  Where a federal

habeas petitioner challenges jury instructions given in a state

criminal proceeding,

> [t]he only question for us is "whether the ailing
> instruction by itself so infected the entire trial that
> the resulting conviction violates due process."  It is
> well established that the instruction "may not be
> judged in artificial isolation," but must be considered
> in the context of the instructions as a whole and the
> trial record.  In addition, in reviewing an ambiguous
> instruction ..., we inquire "whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way" that violates the
> Constitution.  And we also bear in mind our previous
> admonition that we "have defined the category of
> infractions that violate 'fundamental fairness' very
> narrowly."  "Beyond the specific guarantees enumerated
> in the Bill of Rights, the Due Process Clause has
> limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations

omitted).  Thus, the Due Process Clause is violated only where

"the erroneous instructions have operated to lift the burden of

proof on an essential element of an offense as defined by state

law."  Smith v. Horn, 120 F.3d 400, 416 (1997).  See also In re

Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause

protects the accused against conviction except upon proof beyond

a reasonable doubt of every fact necessary to constitute the

crime with which he is charged"); Sandstrom v. Montana, 442 U.S.

510, 523 (1979) (jury instructions that suggest a jury may

convict without proving each element of a crime beyond a

reasonable doubt violate the constitutional rights of the

accused).

Where such a constitutional error has occurred, it is

subject to "harmless error" analysis.  Smith v. Horn, 120 F.3d at

416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999).  "[I]f

28

the [federal habeas] court concludes from the record that the
error had a 'substantial and injurious effect or influence' on
the verdict, or if it is in 'grave doubt' whether that is so, the
error cannot be deemed harmless."  Id. at 418 (citing California
v. Roy, 519 U.S. 2, 5 (1996)).  In evaluating a challenged
instruction,

> a single instruction to a jury may not be judged in
> artificial isolation, but must be viewed in the context
> of the overall charge.  If the charge as a whole is
> ambiguous, the question is whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way that violates the
> Constitution.

Middleton v. McNeil, 541 U.S. 433, 437 (2004) (internal
quotations and citations omitted).

Here, it is apparent from the trial court's repeated use of
the term "beyond a reasonable doubt," that there is no reasonable
likelihood that the jury applied the instructions in a way that
permitted conviction based upon a lesser standard of proof.  In
addition, this Court can discern no error in the instruction as
to the use of the tape.

The decision of the Appellate Division was neither contrary
to, nor an unreasonable application of, clearly established
federal law, nor was it based on an unreasonable determination of
the facts in light of the evidence presented.  Petitioner is not
entitled to relief on this claim.

29

F.  <u>Prosecutorial Misconduct</u>

Petitioner argues that the prosecutor's closing argument was improper in making statements not supported by the evidence, including a statement that Petitioner had been identified. Specifically, before the Appellate Division, Petitioner objected to the prosecutor's statement in summation that there was evidence that Petitioner had been seen driving the Jeep.  This evidence tied Petitioner to Rutan and to the string of robberies.

At trial, a stipulation had been read into the record on the subject of who had been seen in the jeep.  The official transcript read that <u>Rutan</u> had been seen in the jeep.  The state argued that the transcript was in error and that the stipulation was that <u>Petitioner</u> had been seen in the jeep.  Petitioner's argument before the Appellate Division resulted in a remand to determine whether to correct the record regarding the stipulation.  Following a hearing, the trial court ordered the transcript corrected to reflect that the parties had stipulated that <u>Petitioner</u> had been seen driving the Jeep.

Petitioner also objected to the remand and correction of the trial transcript.  The Appellate Division rejected Petitioner's claim.

> Defendant argues that the trial court erred in correcting the trial transcript to substitute his name for that of Rutan in one portion of a stipulation entered into between defendant and the state.  We disagree.

30

On May 3, 2001, we granted the State's motion to remand for a hearing on the State's application to correct the trial court record.  The trial judge conducted a hearing on September 21, 2001 and ordered that page twelve, line seven of the July 30, 1998 transcript would be changed from:  "Mr. Rutan was seen riding in the jeep ..." to "Mr. Vandever was seen driving the Jeep in the days before it was seized." Defendant argues that the trial judge's decision to change the line in the transcript was in error.

The trial judge's decision to change the transcript is entitled to deference.  See State v. Jenkins, 349 N.J. Super. 464, 479 (App. Div.), certif. denied, 174 N.J. 43 (2002).  Although case law suggests that appellate courts should defer to the words of the trial transcript when issues of mistake or error are involved, the issue in the reported cases concern discrepancies as to sentencing between the transcript and the written judgment.  See State v. Warmbrun, 277 N.J. Super. 51, 58 (App. Div.), certif. denied, 140 N.J. 227 (1994); State v. Pohlabel, 40 N.J. Super. 416 (App. Div. 1956).  On the other hand, we have sustained a finding that the written transcript was in error where the facts clearly supported that conclusion. Jenkins, supra, 349 N.J. Super. at 479.

Here, as well, considering the facts outlined above and the judge's intimate familiarity with the trial proceedings, the judge's decision to correct the transcript is not subject to reversal.

(Resp. Ex. 4 at 15-16.)

Petitioner's challenge to the remand and correction of the record appears to be a Due Process Clause challenge.  Again, the standard is whether the remand and correction of the record deprived Petitioner of fundamental fairness.  See Estelle v. McGuire, 502 U.S. 62 (1991).  Petitioner was afforded a hearing on the issue of the correctness of the transcript, and he was represented by counsel at that hearing.  (Resp. Ex., Tr. of

31

September 21, 2001.)  Petitioner's trial counsel appeared as a witness at that hearing.  And Petitioner was permitted to, and did, appeal the decision of the trial court to correct the record.  Petitioner was not deprived of due process in the procedure to correct the record.

With respect to the claim of prosecutorial misconduct, the U.S. Supreme Court has recognized the obligation of a prosecutor to conduct a criminal prosecution with propriety and fairness.

> He may prosecute with earnestness and vigor – indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. ...  Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).  "The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone.  Prosecutors sometime breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence."  United States v. Young, 470 U.S. 1, 7 (1985).

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur

of the Government and may induce the jury to trust the
Government's judgment rather than its own view of the
evidence.

Id. at 18.

Under U.S. Supreme Court precedent, where a prosecutor's
opening or closing remarks are challenged in habeas, "[t]he
relevant question is whether the prosecutor's comments 'so
infected the trial with unfairness as to make the resulting
conviction a denial of due process.'" Darden v. Wainwright, 477
U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S.
637 (1974)).  In evaluating the likely effect of improper
comments, a court may consider whether the improper comments were
invited by or responsive to prior comments by opposing counsel.
Darden, 477 U.S. at 181-82.  Thus, "Supreme Court precedent
counsels that the reviewing court must examine the prosecutor's
offensive actions in context and in light of the entire trial,
assessing the severity of the conduct, the effect of the curative
instructions, and the quantum of evidence against the defendant."
Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

The propriety of the prosecutor's closing arguments depends
upon whether there was, in fact, evidence that Petitioner was
seen driving the jeep.  As the corrected trial record includes
such evidence, there was no impropriety in the prosecutor's
reference to that evidence.

33

The decision of the Appellate Division was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Petitioner is not entitled to relief on this claim.

G.   Excessive Sentence

Petitioner contends that his sentence is excessive.

The Appellate Division rejected this claim:

> Finally, defendant contends that the trial court erred in sentencing him to the maximum possible term on count one (Crosby Jewelers), in imposing parole ineligibility periods on counts four and seven (7-11's in Montvale and Waldwick), and in imposing consecutive sentences on all three robberies.
>
> We find no error in the court's determination as to the applicable aggravating and mitigating factors, and the resulting sentence on count one.  State v. Roth, 95 N.J. 334, 363-65 (1984).  See also State v. Roach, 146 N.J. 208, 230, cert. denied, 519 U.S. 1021, 117 S.Ct. 540, 136 L.Ed.2d 424 (1996); State v. Megargel, 143 N.J. 484, 493-94 (1996); State v. O'Donnella, 117 N.J. 210, 215-16 (1989).  Similarly, the imposition of parole ineligibility terms on counts four and seven were clearly justified based on the court's finding, as to each, that it was "clearly convinced that the aggravating factors substantially outweigh the mitigating factors."  Here, the trial court found no mitigating factors.
>
> Additionally, the court's decision to impose consecutive sentences was fully in accord with State v. Yarbough, 100 N.J. 627, 644 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986); see also State v. Walker, 322 N.J. Super. 535, 556 (App. Div. 1999).  There was no abuse of discretion.
>
> In sum, defendant was fairly tried and convicted and received a harsh but clearly merited sentence for his abhorrent behavior.

34

(Resp. Ex. 4 at 26-27.)

A federal court's ability to review state sentences is limited to challenges based upon "proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies." See Grecco v. O'Lone, 661, F.Supp. 408, 415 (D.N.J. 1987) (citation omitted).  Thus, a challenge to a state court's discretion at sentencing is not reviewable in a federal habeas proceeding unless it violates a separate federal constitutional limitation.  See Pringle v. Court of Common Pleas, 744 F.2d 297, 300 (3d Cir. 1984).  See also 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67 (1991); Lewis v. Jeffers, 497 U.S. 764, 780 (1990).

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" Ewing v. California, 538 U.S. 11, 20 (2003) (citations omitted).  The Supreme Court has identified three factors that may be relevant to a determination of whether a sentence is so disproportionate to the crime committed that it violates the Eighth Amendment:  "(1) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." Solem v. Helm, 463 U.S. 277, 292 (1983).  More recently, Justice Kennedy has explained that Solem

35

does not mandate comparative analysis within and between jurisdictions, see Harmelin v. Michigan, 501 U.S. 957, 1004-05 (Kennedy, J., concurring in part and concurring in judgment), and he has identified four principles of proportionality review--"the primacy of the legislature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors"--that "inform the final one: The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime," id. at 1001 (citation omitted) quoted with approval in Ewing, 538 U.S. at 23.

Petitioner's sentence of fifty years imprisonment for commission of two robberies and a third attempted robbery falls within the statutory range and is not "grossly disproportionate" to the crimes committed.

The decision of the Appellate Division was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Petitioner is not entitled to relief on this claim.

IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be

36

taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

Petitioner has failed to make a substantial showing of the denial of a constitutional right.  No certificate of appealability will issue.

V.   <u>CONCLUSION</u>

For the reasons set forth above, the Petition must be denied.  An appropriate order follows.

 /S/ WILLIAM G. BASSLER
William G. Bassler
Senior United States District Judge

Dated: 31 May 2006

37
